**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 14-4292
_____


UNITED STATES OF AMERICA EX REL.
MOORE & COMPANY, P.A.,

Appellant

v.

MAJESTIC BLUE FISHERIES, LLC; PACIFIC BREEZE
FISHERIES, LLC; DONGWON INDUSTRIES COMPANY,
LTD; JAYNE SONGMI KIM; JOYCE JUNGMI KIM; AND
JAEWOONG KIM

On Appeal from the United States District Court
for the District of Delaware
(District Court No.: 1-12-cv-01562)
District Court Judge:  Honorable Sue L. Robinson

Argued on September 9, 2015

Before: VANASKIE, NYGAARD and RENDELL, <u>Circuit Judges</u>

(Opinion filed: February 2, 2016)

Clay M. Naughton, Esquire **(Argued)**
Moore & Company
355 Alhambra Circle, Suite 1100
Coral Gables, FL   33134

Phillip A. Giordano, Esquire
William M. Kelleher, Esquire
Gordon Fournaris & Mammarella
1925 Lovering Avenue
Wilmington, DE 19806

        Counsel for Appellant


Robert S. Salcido, Esquire **(Argued)**
Akin, Gump, Strauss, Hauer & Feld
1333 New Hampshire Avenue, N.W.
Suite 400
Washington, DC   20036

        Counsel for Appellees

## OPINION

**RENDELL**, Circuit Judge:

Under the South Pacific Tuna Treaty ("SPTT"), a limited number of licenses to fish the tuna-rich waters of the Pacific Island nations are available to vessels under the control and command of U.S. citizens. Moore & Company, P.A. ("Moore"), a law firm, commenced this False Claims Act ("FCA") action against Korean nationals and LLCs formed by them, alleging that the LLCs acquired two of these SPTT licenses by fraudulently certifying to the U.S. government that they were controlled by U.S. citizens and that their fishing vessels were commanded by U.S. captains. Moore first learned of this alleged fraud through discovery in a wrongful death action that it litigated in federal court against two of the defendants in this case. The issue before us is whether the District Court, in dismissing Moore's action, properly interpreted the FCA's public disclosure bar and its "original source" exception, particularly the 2010 amendments to these provisions.

The FCA empowers a person, or "relator," to sue on behalf of the United States those who defraud the government, and to share in any ultimate recovery.[1] But the FCA's public disclosure bar forecloses a relator's action when the alleged fraud has been publicly disclosed in at least

---

[1] This type of action is commonly referred to as a *qui tam* suit.

3

one of several enumerated sources—*unless* the relator is an original source of certain information underlying the action.

In 2010, Congress amended the public disclosure bar as part of the Patient Protection and Affordable Care Act ("PPACA"). In doing so, it removed the language that explicitly stated that a court was deprived of "jurisdiction" over the FCA action if the bar applied to that action; reduced the number of enumerated public disclosure sources; and expanded the definition of "original source" by allowing a relator who "materially adds" to the publicly disclosed information to qualify.

Each of these three changes is implicated in this case, as Moore argues that the District Court erred by (1) construing the amended bar as a jurisdictional limitation, so that it improperly dismissed the action under Rule 12(b)(1) rather than Rule 12(b)(6); (2) ruling that the allegations or transactions of the alleged fraud were publicly disclosed; and (3) concluding that Moore was not an original source. We agree that the public disclosure bar is no longer jurisdictional and that the motion therefore should have been decided under Rule 12(b)(6) rather than Rule 12(b)(1). We further conclude that the alleged fraud was publicly disclosed, but that Moore was nevertheless an original source of information underlying the action.

At issue on appeal is *not* whether Moore has alleged an actionable fraud.[2] Rather, what is contested is whether the

---

[2] In addition to moving under Rule 12(b)(1) to dismiss the complaint for lack of jurisdiction, the defendants moved under Rule 12(b)(6) to dismiss the complaint as not alleging

4

alleged fraud was disclosed through any of the qualifying public disclosure sources, and if so, whether Moore has materially added to those public disclosures by contributing details of the alleged fraud that it independently uncovered through discovery in the wrongful death action in federal court. The answers to these questions turn on how we apply the public disclosure bar as amended by the PPACA. We will begin with a discussion of the significance of the bar's new provisions.

## I.     The 2010 Amendments to the FCA's Public Disclosure Bar

The FCA is a relic of the Civil War, but its public disclosure bar was engrafted on the Act more recently. The original FCA did not require a relator to possess firsthand knowledge of a previously unknown fraud. As a result, in the early 1940s, some enterprising individuals filed FCA actions based not on their own independent knowledge of a fraud but on information revealed in the government's criminal indictments. S. Rep. No. 99-345, at 10–11 (1986). To counteract these "parasitic lawsuits," Congress added a provision in 1943 that denied jurisdiction over FCA actions that were "based upon evidence or information in the possession of the United States, or any agency, officer or employee thereof, at the time such suit was brought." 31 U.S.C. § 232(C) (1946). But this "government knowledge defense" did not just eradicate the parasitic lawsuits; it

---

an actionable fraud. The District Court, however, did not reach this issue, as it granted the defendants' Rule 12(b)(1) motion based on the public disclosure bar.

eliminated most FCA lawsuits, for courts strictly interpreted § 232(C) as barring FCA actions even when the government knew of the fraud only because the relator had reported it. *See United States ex rel. Findley v. FPC-Boron Employees' Club*, 105 F.3d 675, 680 (D.C. Cir. 1997) ("[B]y restricting *qui tam* suits by individuals who brought fraudulent activity to the government's attention, Congress had killed the goose that laid the golden egg and eliminated the financial incentive to expose fraud against the government.").

Against this backdrop, Congress amended the FCA in 1986, replacing the government knowledge defense with the less restrictive public disclosure bar. This bar precluded a relator from bringing an action that was based on allegations or transactions of fraud that had been publicly disclosed in certain enumerated sources, but added an exception if the relator was an "original source" of the information underlying the action:

> (4)(A) No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in [i] a criminal, civil, or administrative hearing, [ii] in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or [iii] from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

31 U.S.C. § 3730(e)(4)(A) (2006). An "original source" was defined as "an individual who has direct and independent knowledge of the information on which the allegations are

based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information." *Id.* § 3730(e)(4)(B).

Although the original public disclosure bar was less restrictive than the government knowledge defense, it was by no means a low bar for relators to clear. Indeed, given its broad language, as well as different courts' varying interpretations of that language, relators faced a formidable hurdle.

In 2010, Congress amended the bar as part of the PPACA so that it now reads as follows:

> (4)(A) *The court shall dismiss an action or claim under this section*, *unless opposed by the Government*, if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed—
>
> > (i) in a *Federal* criminal, civil, or administrative *hearing in which the Government or its agent is a party*;
> >
> > (ii) in a congressional, Government Accountability Office, or other Federal report, hearing, audit or investigation; or
> >
> > (iii) from the news media,
>
> unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

7

(B) For purposes of this paragraph, "original source" means *an individual* who either (i) prior to a public disclosure under subsection (e)(4)(A), has voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based, or (2) *who has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions*, and who has voluntarily provided the information to the Government before filing an action under this section.

31 U.S.C. § 3730(e)(4)(A), (B) (2012) (emphases added).

The italicized language has radically changed the "hurdle" for relators. First, the bar's preliminary language no longer explicitly states that a court is deprived of "jurisdiction" over the FCA action if the bar applies. *Compare* 31 U.S.C. § 3730(e)(4)(A) (2006) ("No court shall have jurisdiction over an action under this section . . . ."), *with id.* § 3730(e)(4)(A) (2012) ("The court shall dismiss an action or claim under this section, unless opposed by the Government . . . ."). Second, information that was disclosed in a criminal, civil, or administrative hearing now qualifies as a public disclosure only if the information was disclosed in a federal case to which the government was a party. *Compare* 31 U.S.C. § 3730(e)(4)(A) (2006) (listing a "criminal, civil, or administrative hearing" as a public disclosure source), *with id.* § 3730(e)(4)(A)(i) (2012) (listing "a Federal criminal, civil, or administrative hearing in which the Government or

8

its agent is a party" as a public disclosure source). As a result, information that was disclosed in a federal case between private parties no longer constitutes publicly disclosed information.

Lastly, Congress expanded the definition of "original source" in § 3730(e)(4)(B). The salient question is no longer whether the relator has "direct and independent knowledge" of the information on which the allegations in the complaint are based. 31 U.S.C. § 3730(e)(4)(B) (2006). Rather, original source status now turns on whether the relator has "knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions." *Id.* § 3730(e)(4)(B) (2012). Significantly, a relator no longer must possess "direct . . . knowledge" of the fraud to qualify as an original source. *See United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Prudential Ins. Co.*, 944 F.2d 1149, 1160 (3d Cir. 1991) (holding under the pre-PPACA bar that a law-firm relator lacked direct knowledge because it had learned of the fraud "through two intermediaries," one of which was "the discovery procedure by which the memoranda [exposing the alleged fraud] were produced"). The focus now is on what independent knowledge the relator has added to what was publicly disclosed.

In short, with its 2010 amendments, Congress overhauled the public disclosure bar. Although no direct legislative history seems to exist, the textual changes alone evince Congress's intent to lower the bar for relators, at least

as to some of its components. With these changes in mind, we turn to the issues presented in this case.[3]

## II. Nonjurisdictional Character of the Amended Public Disclosure Bar

We first address Moore's contention that, by virtue of Congress's change to the bar's preliminary language, the District Court should have decided the case under Rule 12(b)(6) for failure to state a claim rather than under Rule 12(b)(1) for lack of jurisdiction.[4] While the pre-PPACA bar stated that "[n]o court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions [in certain enumerated sources]," 31 U.S.C. § 3730(e)(4)(A) (2006), the post-PPACA bar states that "[t]he court shall dismiss an action or claim under this

---

[3] The District Court had jurisdiction under 28 U.S.C. § 1331, and we have jurisdiction under 28 U.S.C. § 1291. We review de novo the District Court's decision on a motion to dismiss. *McTernan v. City of York, Penn.*, 577 F.3d 521, 526 (3d Cir. 2009).

[4] In considering a Rule 12(b)(1) motion to dismiss for lack of jurisdiction, "the court may [usually] consider and weigh evidence outside the pleadings to determine if it has jurisdiction," and "[t]he plaintiff has the burden of persuasion to convince the court it has jurisdiction." *Gould Electronics Inc. v. United States*, 220 F.3d 169, 178 (3d Cir. 2000). By contrast, in considering a Rule 12(b)(6) motion to dismiss for failure to state a claim, a court generally considers only the allegations in the complaint, accepting them as true, and the defendant bears the burden of showing that the plaintiff has not stated a claim. *Id.*

10

section, unless opposed by the Government, if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed [in certain enumerated sources]," *id.* § 3730(e)(4)(A) (2012). With little analysis, the District Court declared that this amended provision, like its predecessor, presented a jurisdictional bar. We disagree and join the other circuits that have ruled that the amended version does not set forth a jurisdictional bar. *See United States ex rel. Osheroff v. Humana, Inc.*, 776 F.3d 805, 810 (11th Cir. 2015) ("We conclude that the amended § 3730(e)(4) creates grounds for dismissal for failure to state a claim rather than for lack of jurisdiction."); *United States ex rel. May v. Purdue Pharma L.P.*, 737 F.3d 908, 916 (4th Cir. 2013) ("It is apparent . . . that the public-disclosure bar is no longer jurisdictional.").

As our sister circuits have reasoned, first, the amended bar makes no mention of jurisdiction, and unless Congress has "'clearly state[d]' that the [statutory limitation] is jurisdictional . . ., 'courts should treat the restriction as nonjurisdictional in character.'" *Sebelius v. Auburn Reg'l Med. Ctr.*, 133 S. Ct. 817, 824 (2013) (quoting *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 515–16 (2006)). Second, in amending the bar, Congress removed the jurisdictional language that prohibited a court from entertaining the suit if the public disclosure bar applied. *See Brewster v. Gage*, 280 U.S. 327, 337 (1930) ("The deliberate selection of language so differing from that used in the earlier acts indicates that a change of law was intended."). Third, Congress left undisturbed similar jurisdictional language in neighboring provisions. *See, e.g.*, 31 U.S.C. § 3730(e)(1) (2012) ("No court shall have jurisdiction over an action brought by a former or present member of the armed services under

11

subsection (b) of this section against a member of the armed forces arising out of such person's service in the armed forces."). Finally, if a court holds that a relator's claim is publically disclosed, the amended bar nonetheless permits the government to oppose the court's dismissal of the action, an option that effectively dispels any notion that the bar is still jurisdictional. *See Gonzalez v. Thaler*, 132 S. Ct. 641, 648 (2012) ("Subject-matter jurisdiction can never be waived or forfeited.").

For these reasons, we conclude that the amended bar is not jurisdictional. Accordingly, the District Court should have decided the defendants' motion to dismiss on public disclosure grounds under Rule 12(b)(6), not Rule 12(b)(1).

III. **Public Disclosure**

We next address whether the fraud alleged by Moore was publicly disclosed. Moore brought this FCA action against Majestic Blue Fisheries, LLC; Pacific Breeze Fisheries, LLC; and Joyce Jungmi Kim, alleging they defrauded the government in that, in order to procure the SPTT fishing licenses, the LLCs fraudulently certified to the U.S. Coast Guard that they were controlled by U.S. citizens and that their eponymous fishing vessels ("F/V Majestic Blue" and "F/V Pacific Breeze") were commanded by U.S. captains.[5] According to Moore, the LLCs, in fact, were controlled by Dongwon Industries, a South Korean tuna company, and their vessels, F/V Majestic Blue and F/V

---

[5] Moore also brought this action against Dongwon Industries Co., Ltd., Jayne Songmi Kim, and Jaewoong Kim, but they were never served and have not entered appearances.

Pacific Breeze, were commanded by Korean fishing masters who worked for Dongwon.[6]

We must decide whether "substantially the same allegations or transactions [of fraud] as alleged in [Moore's] action or claim were publicly disclosed" in any of the enumerated public disclosure sources. 31 U.S.C. § 3730(e)(4)(A) (2012). We first consider whether the sources on which the defendants rely in arguing that the alleged fraud was publicly disclosed qualify as public disclosure sources under § 3730(e)(4)(A). We next determine whether "substantially the same allegations or transactions" of fraud alleged by Moore were publicly disclosed through these qualifying sources. *Id.*

As stated earlier, to be publicly disclosed, the alleged fraud must have been revealed through at least one of three sources: (1) "a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party"; (2) "a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation"; or (3) "news media." *Id.* § 3730(e)(4)(A)(i)–(iii). Here, the defendants argue, as they did in the District Court, that the alleged fraud was publicly disclosed in "news media" and "Federal report[s]."

As "news media," the defendants proffered a mixture of two Internet news articles, a podcast, and a blog, but the

---

[6] To obtain an SPTT license, a vessel must be granted a U.S. Coast Guard certificate of documentation. This certificate is available only to vessels that are under the control and command of U.S. citizens.

District Court concluded that only the two news articles qualified. The first article, "Flogging and Mutiny in the 21st Century, Proudly Waving the Stars and Stripes," which was posted on maritimeaccident.org, describes the experience of Doug Pine, an American who had served as a "captain" of the F/V Majestic Blue ("Maritime Accident article"). (App. 726.) The second, "Coast Guard Probes Island Mariner's Account of Fiasco at Sea," which was posted on vashonbeachcomber.com, also describes Pine's experience aboard the F/V Majestic Blue ("Vashon Beachcomber article"). (App. 731.) Moore concedes that these two articles qualify as "news media."[7]

---

[7] On appeal, the defendants argue that the District Court erred in deciding that the podcast and the blog did not qualify as news media. The podcast was an interview with Doug Pine, and the blog consisted mostly of posted "Responses" by various individuals to Pine's story about his experience on the F/V Majestic Blue. We need not address whether these sources qualify as news media because we conclude that the alleged fraud was publicly disclosed through the two news articles and the documents obtained by Moore through Freedom of Information Act requests.

We also recognize that the defendants attached the two news articles to their motion to dismiss, and that because these articles were not attached to Moore's complaint, a court would not usually consider such evidence in deciding a Rule 12(b)(6) motion. Moore, however, has conceded that these news articles qualify as news media and has not challenged their authenticity, and so we will judicially notice them for the limited purpose of determining "what was in the public realm at the time, not whether the contents of those articles

14

The District Court also decided that certain information that Moore had obtained through Freedom of Information Act ("FOIA") requests constituted "Federal report[s]." This information included the LLCs' allegedly fraudulent certifications to the U.S. Coast Guard that they were controlled by U.S. citizens and that their vessels, F/V Majestic Blue and F/V Pacific Breeze, were commanded by U.S. captains, as well as certain emails sent by a man named "K.Y. Hwang" of "Dongwon Industries."[8] (App. 608.)

In deciding that these FOIA documents constituted federal reports, the District Court relied on *Schindler Elevator Corp. v. United States ex rel. Kirk*, 563 U.S. 401 (2011). There, the Court analyzed whether FOIA documents constitute "report[s]" under the *pre*-PPACA bar and decided that "[a] written agency response to a FOIA request falls within the ordinary meaning of 'report,'" and that "[a]ny records the agency produces along with its written FOIA response are part of that response." *Id.* at 410–11. The District Court concluded that *Schindler*'s interpretation of "report" in the pre-PPACA bar applied with equal force to the post-PPACA bar because a "report" is also a public disclosure source in the post-PPACA bar. *Compare* 31 U.S.C. § 3730(e)(4)(A) (2006) (listing "a congressional, administrative, or Government Accounting office *report*" as a public disclosure source (emphasis added)), *with id.* § 3730(e)(4)(A)(ii) (2012) (listing "a congressional,

---

were in fact true." *Benak ex rel. Alliance Premier Growth Fund v. Appliance Capital Mgmt. L.P.*, 435 F.3d 396, 401 n.15 (3d Cir. 2006).

[8] Moore attached this information to its complaint.

Government Accountability Office, or other Federal *report*" as a public disclosure source (emphasis added)).

While Moore recognizes that a government "report" is also a public disclosure source in the post-PPACA bar, it contends that the Court's interpretation of that word in *Schindler* does not apply to the post-PPACA bar because the pre-PPACA bar is "a much different statute." (Moore's Br. 26.) It further urges us to follow the "guiding philosophy" behind the 2010 amendments to the public disclosure bar, which, it asserts, is that the bar applies only when federal officials are likely to see the public disclosures. (*Id.*)

We reject Moore's argument. The PPACA did not alter the bar in any way that would render *Schindler*'s interpretation of "report" inapplicable to the FOIA documents under consideration here. Moreover, even before *Schindler* was decided, many courts, including our own, had similarly interpreted "report" in the pre-PPACA bar. *See, e.g.*, *United States ex rel. Mistick PBT v. Housing Auth. of Pittsburgh*, 186 F.3d 376, 383 (3d Cir. 1999) (concluding that FOIA documents "fell within the ordinary meaning of the term 'report'"); *United States ex rel. Grynberg v. Praxair, Inc.*, 389 F.3d 1038, 1051 (10th Cir. 2004) ("It is generally accepted that a response to a request under the FOIA is a public disclosure."). When Congress overhauled the bar in 2010, it could have reacted to these cases by excluding FOIA documents as "report[s]." *Cf. Merck & Co., Inc. v. Reynolds*, 559 U.S. 633, 648 (2010) ("We normally assume that, when Congress enacts statutes, it is aware of relevant judicial precedent."). But it did not: it left "report" largely unaltered

16

as a public disclosure source.[9] Congress thus did not amend this source in any way that would cast doubt on the view held by many courts that a "report" includes FOIA documents, a view later confirmed by the Court in *Schindler*.

In addition, Moore's "guiding philosophy" argument rings hollow when we consider that § 3730(e)(4)(A) includes many documents that the government will likely never see. For example, "news media" is a source that "include[s] a large number of local newspapers and radio stations" and therefore "likely describes a multitude of sources that would seldom come to the attention of the Attorney General." *Graham Cty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 559 U.S. 280, 300 (2010).

We next consider whether substantially the same "allegations or transactions" of fraud alleged by Moore were publicly disclosed via the two news articles and the FOIA documents. "An allegation of fraud is an explicit accusation of wrongdoing. A transaction warranting an inference of fraud is one that is composed of a misrepresented state of facts plus the actual state of facts." *United States ex rel. Zizic v. Q2Administrators, LLC*, 728 F.3d 228, 235–36 (3d Cir. 2013). Formulaically this appears as follows: "X (misrepresented state of facts) + Y (true state of facts) = Z (fraud)." *United States ex rel. Dunleavy v. Cty. of Del.*, 123 F.3d 734, 741 (3d Cir. 1997). A defendant must therefore show that substantially the same "allegation[]" of fraud (Z) *or* "transaction[]" of fraud (X + Y) was publicly disclosed through the sources enumerated in § 3730(e)(4)(A).

---

[9] Congress did amend this source so that only "Federal" reports qualify. The FOIA is, of course, a federal statute.

Here, Moore's "allegation" of fraud (Z) is that the defendants fraudulently procured certificates of documentation from the U.S. Coast Guard so that they could obtain the SPTT fishing licenses. As for the "transaction" of that fraud, it alleges that the defendants certified to the U.S. Coast Guard that U.S. citizens controlled the LLCs and commanded their vessels (the mispresented state of facts, or X) when in fact Dongwon both controlled the LLCs and commanded their vessels (the true state of facts, or Y). The defendants have shown that substantially this same "transaction" was publicly disclosed.

In the applications for certificates of documentation that the LLCs filed with the U.S. Coast Guard and that were obtained by Moore through FOIA requests, Majestic Blue LLC and Pacific Breeze LLC certified that "non-citizens do not have authority within a management group, whether through veto power, combined voting, or otherwise, to exercise control over the LLC[s]," and that their eponymous fishing vessels "will at all times remain under the command of a U.S. citizen." (App. 233–34, 236–37.)

However, the two news articles indicate that Majestic Blue LLC is not controlled by U.S. citizens, nor is its vessel commanded by a U.S. captain. The Vashon Beachcomber article describes how Doug Pine accepted a position on the F/V Majestic Blue "as captain of the Korean-managed ship," states that the F/V Majestic Blue is "operated by a Korean company," and even names that company as "Korea's Dongwon Corporation." (App. 731.) The Maritime Accident article reveals how the Korean fishing master, not Captain Pine, commanded the vessel:

18

When the [F/V Majestic Blue] was registered in the US, the Korean captain became the fishmaster and Captain Pine joined as Captain. It was an uncomfortable relationship.

. . . .

Pine found it difficult to exercise his authority almost from the moment he first boarded the vessel: "The first day I was aboard I asked for the crew list[.] It was ordered by rank. I was Number Two, the fishmaster was number 1. The second officer refused a direct order to change it. The Korean officers refused to obey any routine command activity.

In fact, Pine was supposed to simply be a "paper captain" to meet the requirements of the US flag and to accept the authority of the fishmaster, the former captain. Pine was unable to manoeuver the vessel or use the navigation equipment on the bridge.

(App. 726.)

Less apparent, though still publicly disclosed, is the true state of facts (the "Y") for Pacific Breeze LLC and its vessel, revealed through emails sent by K.Y. Hwang of Dongwon Industries and obtained by Moore via FOIA requests. (Notably, these emails also support the true state of facts for Majestic Blue LLC and its vessel.) In one email, K.Y. Hwang informs the recipient that he is "from Dongwon Industries" and is "in charge of care for F/V Majestic Blue & Pacific Breeze." (App. 608.) He writes that he has received a

19

message from the LLCs' general manager and that he is worried about the looming expiration of the vessels' SPTT licenses. In a second email, addressed to the LLCs' general manager, he states that "[w]e [Dongwon] are studying the possibility of our US flagged fishing vessel' [sic] operation in Atlantic Ocean." (App. 609–10.) Relying on these emails, Moore itself alleges in its complaint that "[c]learly, Dongwon, rather than any U.S. Citizen, maintained operational control over the LLCs and made all major decisions for Majestic Blue and Pacific Breeze." (App. 47.) It further contends that "[b]y Dongwon's own admission [], the Vessels are part of Dongwon's 'US flagged fishing vessel operation' and were not really owned or controlled by U.S. Citizens despite Defendants' contrary certifications to the U.S. Government." (App. 48.)

In sum, we have little difficulty concluding that the transaction setting forth the alleged fraud was publicly disclosed via the two news articles and the FOIA documents.

## IV.    Original Source

Moore can nonetheless clear the bar if it qualifies as an "original source." The post-PPACA bar defines an original source as one "who has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions." 31 U.S.C. § 3730(e)(4)(B) (2012). In support of its case for original source status, Moore relies on information that it obtained from discovery in a federal civil case. In June 2010, the F/V Majestic Blue sank in the South Pacific, resulting in the death of its captain, David Hill. Moore represented Hill's wife in a wrongful death action in federal court against Majestic Blue LLC and Dongwon. In discovery

20

in that litigation, Moore obtained documents and deposed individuals including K.Y. Hwang, and Joyce Kim and Jayne Kim, the LLCs' sole shareholders. From this discovery, Moore not only first learned of the alleged fraud but also uncovered details as to how it unfolded. Moore argues, as it must, that this information that it obtained in the wrongful death action is independent of, and materially adds to, the publicly disclosed transaction of fraud. We agree.

## A.     Independent of

The District Court held that Moore was not an original source because the information that it had obtained through discovery in the wrongful death action did not constitute "independent knowledge." In doing so, it analyzed Moore's knowledge according to our jurisprudence under the pre-PPACA bar whereby we had required that a relator's knowledge must be independent not just from information that qualified as a public disclosure under § 3730(e)(4)(A), but also from information readily available in the public domain. *See United States ex rel. Atkinson v. Pa. Shipbuilding Co.*, 473 F.3d 506, 522 (3d Cir. 2007) (stating that while "reliance solely on 'public disclosures' under § 3730(e)(4)(A) is *always* insufficient under § 3730(e)(4)(B) to confer original source status, reliance on public information that does not qualify as a public disclosure under § 3730(e)(4)(A) may also preclude original source status depending on . . . . the availability of the information and the amount of labor and deduction required to construct the claim" (citation and quotation marks omitted)). Informed by this pre-PPACA interpretation, the District Court concluded that Moore's knowledge was not independent because the information

21

obtained in the civil litigation was in the "public domain" and not "obscure." (App. 23.)

Although the District Court was correct in interpreting our pre-PPACA jurisprudence, it erred in concluding that this interpretation of independent knowledge should also apply to the post-PPACA bar. As noted earlier, the pre-PPACA bar defined an original source as "an individual who has direct and independent knowledge of the information on which the [complaint's] allegations are based." 31 U.S.C. § 3730(e)(4)(B) (2006). This definition does not indicate what the knowledge must be independent from and makes no reference to the public disclosure sources enumerated in § 3730(e)(4)(A). Accordingly, we reasoned that the relator's knowledge needed to be independent from information readily available in the public domain. *See Atkinson*, 473 F.3d at 522–23.

But the PPACA's new definition of original source requires an entirely different analysis. An original source is now defined as one "who has knowledge that is independent of and materially adds to *the publicly disclosed allegations or transactions*." 31 § 3730(e)(4)(B) (2012) (emphasis added). This definition therefore states that a relator's knowledge must be independent of, and materially add to, not all information readily available in the public domain, but, rather, only information revealed through a public disclosure source in § 3730(e)(4)(A).

Indeed, the text plainly requires courts to compare the relator's knowledge with the information that was disclosed through the public disclosure sources enumerated in § 3730(e)(4)(A). By using the definite article "the" before

22

"publicly disclosed allegations or transactions" in § 3730(e)(4)(B), Congress has referred back to the public disclosures in § 3730(e)(4)(A). *See New Oxford American Dictionary* 1748 (2d ed. 2005) (defining "the" as a word "denoting one or more people or things already mentioned"). Congress also tied the definition of "original source" in § 3730(e)(4)(B) to public disclosures in § 3730(e)(4)(A) by employing the identical phrases "allegations or transactions" and "publicly disclosed" in both provisions. *Compare* 31 U.S.C. § 3730(e)(4)(A) (2012) ("The court shall dismiss an action . . . if substantially the same *allegations or transactions* as alleged in the action or claim were *publicly disclosed* [in the following enumerated sources]." (emphases added)), *with id.* § 3730(e)(4)(B) (defining original source as one "who has knowledge that is independent of and materially adds to the *publicly disclosed allegations or transactions.*" (emphasis added)); *cf. Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 471 (2007) (deciding that the word "allegations" that was used in both § 3730(e)(4)(A) and § 3730(e)(4)(B) of the *pre*-PPACA bar meant different things because § 3730(e)(4)(B) did not also refer to "transactions" and "[h]ad Congress wanted to link original-source status to information underlying the public disclosure, it would surely have used the identical phrase, 'allegations or transactions'").[10]

---

[10] It would also make little sense to apply our interpretation of "independent knowledge" under the pre-PPACA bar to the post-PPACA bar. In addition to "independent of," "materially adds to" modifies "the publicly disclosed allegations or transactions." So if "the publicly disclosed allegations or transactions" included not just public disclosures under § 3730(e)(4)(A) but also other information in the public domain, we would ask whether the relator's knowledge

23

Applying this new definition of original source to the information that Moore gained through discovery in the wrongful death action as to how Dongwon established and controlled the LLCs, information that we will describe in more detail below, we conclude that Moore possesses knowledge that is "independent of . . . the publicly disclosed allegations or transactions." 31 U.S.C. § 3730(e)(4)(B) (2012).

### B.    Materially Adds

Through the wrongful death action, Moore contends that it learned, and thus alleged, numerous details that "materially add[]" to the publicly disclosed transaction of fraud, as is required for the original source exception to apply. As we will describe in more detail below, Moore discovered information such as what specific individuals were involved in the alleged fraud and how they initiated and perpetrated the alleged transgression.

We have not previously interpreted "materially adds." The word "add" means to "put (something) in or on something else so as to improve or alter its quality or nature." *New Oxford Dictionary*, *supra*, at 18. And "material" is defined as "significant, influential, or relevant." *Id.* at 1045. So to "materially add[]" to the publicly disclosed allegation or

---

materially adds to that information in the public domain. This would often lead to circular inquiries. Here, for example, we would ask whether Moore's knowledge that it gleaned from discovery in the wrongful death action materially adds to that same information.

24

transaction of fraud, a relator must contribute significant additional information to that which has been publicly disclosed so as to improve its quality.

The defendants concur with this definition but argue that Moore falls outside of it. Citing cases from other circuits, they contend that the information that Moore obtained through the wrongful death action merely provides additional details that are immaterial because they only support the transaction of fraud that was already publicly disclosed. *See, e.g.*, *United States ex rel. Osheroff v. Humana, Inc.*, 776 F.3d 805, 815 (11th Cir. 2015) (holding relator was not original source because he provided only additional background information to the publicly disclosed fraud). According to the defendants, because the essential elements of the fraud's transaction were publicly disclosed in the news articles and the FOIA documents, Moore's additional details as to how the fraud originated and transpired do not materially add to the publicly disclosed transaction of fraud.

Yet that cannot be the meaning of the term, for that would read out of the statute the original source exception. The exception, of course, comes into play only when some facts regarding the allegation or transaction have been publicly disclosed. The salient issue, then, is how to distinguish additional but immaterial information from information that "materially adds" to the publicly disclosed allegation or transaction of fraud.

Rule 9(b)'s pleading requirement is of some assistance. Under Rule 9(b), which applies to FCA actions, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."

25

*Foglia v. Renal Ventures Mgmt., LLC*, 754 F.3d 153, 155 (3d Cir. 2014) (quoting Fed. R. Civ. P. 9(b)). A plaintiff alleging fraud must therefore support its allegations "with all of the essential factual background that would accompany the first paragraph of any newspaper story—that is, the who, what, when, where and how of the events at issue." *In re Rockefeller Ctr. Props., Inc. Securities Litig.*, 311 F.3d 198, 217 (3d Cir. 2002) (citation and quotation marks omitted). In our view, this standard also serves as a helpful benchmark for measuring "materially adds." Specifically, a relator materially adds to the publicly disclosed allegation or transaction of fraud when it contributes information—distinct from what was publicly disclosed—that adds in a significant way to the essential factual background: "the who, what, when, where and how of the events at issue."[11] *Id.*

Moore has satisfied that standard with certain information that it learned through discovery in the wrongful death action. Indeed, with this information, it has contributed significant, specific details that were not publicly disclosed as to how Dongwon surreptitiously established and controlled Majestic Blue LLC and Pacific Breeze LLC.

For example, based on the discovery that it obtained in the wrongful death action, Moore alleged that in 2008, Jawoong Kim, a former Dongwon executive and brother of the company's chairman, approached his daughters, Joyce and Jayne Kim, who are U.S. citizens, and asked them to form U.S. LLCs to "buy" two fishing vessels from Dongwon.

---

[11] To be clear, this standard is intended to apply when a relator's original source status is at issue at any stage of the litigation—not just at the motion to dismiss stage.

The Kim sisters then formed Majestic Blue LLC and Pacific Breeze LLC and assumed from Dongwon record ownership of the F/V Majestic Blue and the F/V Pacific Breeze. But the Kim sisters served only as straw owners of the two LLCs: they capitalized each LLC with a mere $50.00, and they knew nothing about the business operations of the LLCs, relying entirely on their father Jawoong Kim to manage the companies.[12]

Moore also alleged that Dongwon never actually "sold" the vessels to the LLCs. To "buy" the vessels from Dongwon, the Kim sisters signed agreements in which the LLCs agreed to pay $4.4 million for each vessel. Yet these agreements did not hold the Kim sisters personally responsible for paying the LLCs' debt, despite the LLCs' negligible capital. Nor did Dongwon take out a mortgage on the vessels. And neither the Kim sisters nor the LLCs ever paid any money to Dongwon for these vessels.

---

[12] In footnote 7 *supra*, we declined to say whether the podcast interview with Doug Pine qualified as "news media." In that interview, Pine stated generally that two sisters with U.S. citizenship owned the LLCs and that their U.S. citizenship was being exploited by Dongwon. But even if the podcast qualified as news media, the specific information that Moore obtained in discovery about the Kim sisters and Dongwon is distinct from, and adds significantly to, the vague information disclosed by the podcast. Unlike the podcast, Moore's discovery documents revealed the sisters' names and their lack of knowledge about the LLCs; their father's name, his affiliation with Dongwon, and his initiation of the alleged fraud; and details as to how the LLCs were structured and poorly capitalized.

Moore further alleged that Dongwon created a fake "manager" of the LLCs to initiate the SPTT license application process. At one point, "William Phil," who claimed to be the LLCs' manager, emailed the National Marine Fisheries Service and the U.S. Coast Guard about obtaining the SPTT licenses. (App. 43.) "William Phil," though, was "a pseudonym for three Korean nationals who are also employees of Dongwon who operated under the false name in order to sound more like an American citizen." (*Id.*) In fact, Joyce Kim testified in a 2011 deposition that she had never even heard of him.

We conclude that this information added to the publicly disclosed information in a material way. While the information set forth in the two news articles and the FOIA documents publicly disclosed the basic elements of the fraud's transaction (i.e, the "X + Y"), the information that Moore acquired from discovery in the wrongful death action added significant details to the essential factual background of the fraud—the who, what, when, where, and how of the alleged fraud—that were not publicly disclosed.

V.    **Conclusion**

Having alleged information that is independent of and materially adds to the publicly disclosed information, Moore is an original source under the post-PPACA public disclosure bar. We will accordingly reverse the District Court's September 23, 2014, order dismissing Moore's action insofar as that order applied to Moore's claims arising under the post-

28

PPACA FCA and will remand the case for further proceedings.[13]

---

[13] We note that there will remain pending in the District Court on remand the defendants' Rule 12(b)(6) motion to dismiss for failure to state a claim that the District Court did not rule on in light of its grant of the defendants' Rule 12(b)(1) motion.