PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 18-3298
_____

UNITED STATES OF AMERICA and STATE OF NEW
JERSEY ex rel. VICTORIA DRUDING; BARBARA BAIN;
LINDA COLEMAN; RONNI O'BRIEN

v.

CARE ALTERNATIVES

Victoria Druding, Barbara Bain, Linda Coleman, and Ronni
O'Brien
Appellants
_____

On Appeal from the United States
District Court for the District of New Jersey
(D.C. Civ. Action No. 1-08-cv-02126)
District Judge: Honorable Jerome B. Simandle
_____

Argued September 10, 2019
_____

Before: HARDIMAN, GREENAWAY, JR. and BIBAS,
*Circuit Judges*.

(Opinion filed: March 4, 2020)

Ross Begelman
Marc M. Orlow
Regina D. Poserina
Begelman Orlow & Melletz
411 Route 70 East
Suite 245
Cherry Hill, NJ 08034

Russell D. Paul [ARGUED]
Sherrie R. Savett
Berger Montague
1818 Market Street
Suite 3600
Philadelphia, PA 19103
        *Counsel for Appellants*

Charles W. Scarborough [ARGUED]
United States Department of Justice
Appellate Section
Room 7244
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
        *Counsel for Amicus Supporting Appellants*

William H. Jordan
Jason Popp [ARGUED]
Alston & Bird
1201 West Peachtree Street
One Atlantic Center
Suite 4900
Atlanta, GA 30309
        *Counsel for Appellee*

_____

OPINION

_____

GREENAWAY, JR., *Circuit Judge*.

This case requires us to consider whether and when clinical judgments can be considered "false" in the context of the False Claims Act ("FCA"), 31 U.S.C. §§ 3729–3733 (2009). It is a matter of first impression in this Court.

Victoria Druding, Linda Coleman, Barbara Bain, and Ronni O'Brien (collectively, "Appellants"), each of whom is a former employee of Appellee Care Alternatives, brought this FCA action alleging that Care Alternatives admitted patients who were ineligible for hospice care and directed its employees to improperly alter those patients' Medicare certifications to reflect eligibility. In support of their position, Appellants retained an expert. The expert opined in his report that, based on the records of the forty-seven patients he examined, the patients were inappropriately certified for hospice care thirty-five percent of the time.

Care Alternatives' expert disagreed and testified that a reasonable physician would have found all of the patients reviewed by Appellants' expert hospice-eligible on each occasion that Appellants' expert had deemed certification inappropriate. In considering Care Alternatives' summary judgment motion, the District Court determined that a mere difference of opinion between experts regarding the accuracy of the prognosis was insufficient to create a triable dispute of fact as to the element of falsity. In fact, the District Court required Appellants to instead provide evidence of an objective falsehood. Upon finding Appellants had not adduced such evidence, the District Court granted summary judgment in favor of Care Alternatives.

Today, we reject the District Court's objective-falsehood requirement for FCA falsity. Since we find that Appellants' expert testimony created a genuine dispute of material fact as to falsity, we will vacate the judgment and remand to the District Court for further proceedings consistent with this opinion.

## I.     BACKGROUND

Care Alternatives provides hospice care to patients throughout New Jersey. It employs a team of clinicians known as "interdisciplinary teams," ("IDTs") consisting of registered nurses, chaplains, social workers, home health aides, and therapists working alongside independent physicians who serve as hospice medical directors. The IDTs meet twice a month to review patient care plans and to identify any particular needs as well as discuss patients who are up for recertification of their need for hospice care.

Appellants are former employees of Care Alternatives, many of whom were clinicians that participated in IDTs. They brought this action under the FCA alleging, among other things, that Care Alternatives admitted ineligible patients and directed its employees to alter Medicare certifications to increase the number of eligible patients.

Before reaching the essential question of whether expert testimony may suffice to generate a genuine dispute as to a Medicare claim's falsity, we will review the requirements that hospice care providers must meet to qualify for Medicare reimbursement and the circumstances leading to this appeal.

## A. Medicare Hospice Benefit

In 1983, Congress established the Medicare Hospice Benefit ("MHB"). *See* 48 Fed. Reg. 56,008 (Dec. 16, 1983) (codified at 42 C.F.R. pts. 400, 405, 408, 409, 418, 420, 421, 489). This regulation expanded the Health and Human Services Secretary's statutory authority to reimburse contractors that provide hospice care to eligible persons. 42 U.S.C. §§ 1395h (2006), 1395kk-1 (2015). Hospice care is considered palliative care, meaning it is "patient and family-centered care that optimizes quality of life by anticipating, preventing, and treating suffering." 42 C.F.R. § 418.3 (2019). It aims to "mak[e a terminally ill] individual as physically and emotionally comfortable as possible." 48 Fed. Reg. at 56,008. A patient who has been certified as eligible for hospice care and elects to receive the MHB waives the right to Medicare payment for "curative" care that is designed to help improve the individual's condition. *See* 42 U.S.C. § 1395d(d)(2)(A) (2005); 42 C.F.R. § 418.24(e) (2019); 72 Fed. Reg. 50,452, 50,452 (Aug. 22, 2014).

The Medicare provisions that set forth the conditions for payment of the MHB require that an individual be certified within a ninety-day period by one or more physicians as terminally ill. 42 U.S.C. § 1395f(a)(7)(A)(i). The patient must also be recertified in a similar manner for each additional sixty- or ninety-day period during which he or she remains in hospice care.[1] *Id*. § 1395f(a)(7)(A)(ii). An individual is considered "terminally ill" when the individual has a medical prognosis

---

[1] In relevant part, the statute states that:

payment for services furnished an individual may be made . . . only if . . . in the case of hospice care provided an individual—

    (A)(i) in the first 90-day period—

        (I) the individual's attending physician . . . , and

        (II) the medical director . . . of the hospice care program providing (or arranging for) the care, each certify in writing at the beginning of the period, that the individual is terminally ill . . . based on the physician's or medical director's clinical judgment regarding the normal course of the individual's illness, and

    (ii) in a subsequent 90- or 60-day period, the medical director or physician described in clause (i)(II) recertifies at the beginning of the period that the individual is terminally ill based on such clinical judgment . . .

§ 1395f(a)(7)(A); *see also* § 1395f(a)(7)(B)–(E) (providing the other statutory prerequisites).

that the individual's life expectancy is six months or less, if the illness runs its normal course.  *Id*. § 1395x(dd)(3)(A) (2018); 42 C.F.R. § 418.3.

Regulations promulgated by the Secretary add another requirement.  *See* 42 C.F.R. § 418.20.  The regulations provide that, "[i]n order to be eligible to elect hospice care under Medicare, an individual must be . . . (b) Certified as being terminally ill in accordance with § 418.22." *Id*.  Section 418.22, in turn, imposes certain obligations on hospices regarding the timing, content, and source of a certification, in addition to a maintenance-of-records requirement.  Among these is the requirement that

> [c]linical information and other documentation that support the medical prognosis must accompany the certification and must be filed in the medical record with the written certification as set forth in paragraph (d)(2) of this section.  Initially, the clinical information may be provided verbally, and must be documented in the medical record and included as part of the hospice's eligibility assessment.

§ 418.22(b)(2) (2011).

Therefore, in order for a patient to be eligible to receive the MHB and for a hospice provider to be entitled to bill for such benefits, an individual's certification of terminal illness must be signed by at least one physician, and be accompanied by "[c]linical information and other documentation that support the medical prognosis" of terminal illness in the medical record.  *Id.*  Indeed, while the Center for Medicare & Medicaid Services, the agency responsible for administering health benefits, has recognized that "making a prognosis is not

7

an exact science," it has explained that this inexactitude "does not negate the fact that there must be a clinical basis for a certification[:] [a] hospice is *required* to make certain that the physician's clinical judgment can be supported by clinical information and other documentation that provide a basis for the certification of 6 months or less if the illness runs its normal course." 79 Fed. Reg. at 50,470 (emphasis added); *see also* 70 Fed. Reg. 70,532, 70,534–35 (Nov. 22, 2005) ("A hospice needs to be certain that the physician's clinical judgment can be supported by clinical information and other documentation that provide a basis for the certification of 6 months or less if the illness runs its normal course. A signed certification, absent a medically sound basis that supports the clinical judgment, is not sufficient for application of the hospice benefit under Medicare.").

## B.     Factual and Procedural Background

Appellants brought this suit under the *qui tam* provision of the FCA, which encourages actions by private individuals, called relators, who are entitled to a portion of the amount recovered, subject to certain limitations. *See* 31 U.S.C. § 3730(b), (d). Pursuant to the *qui tam* provision, Appellants filed their complaint under seal and provided the Government with the information upon which they intended to rely so that the Government could make an informed decision as to whether it should intervene and take over the case. *Id.* § 3730(b)(2). Appellants alleged that Care Alternatives submitted false hospice-reimbursement claims to Medicare and Medicaid between 2006 and 2007, in violation of the FCA, which finds liable any person who knowingly submits to the United States a false claim for payment or approval. 31 U.S.C. §§ 3729(a)(1)(A), 3730(b)(1).

8

Seven years after the complaint was filed, the Government notified the District Court of its decision not to intervene in this action. Appellants opted to proceed independently and served the First Amended Qui Tam Complaint upon Care Alternatives.

During discovery, the parties produced extensive evidence addressing whether Care Alternatives admitted ineligible patients. This included dueling expert opinions. Appellants' expert, Dr. Jayes, prepared a report as to whether patient certifications were accompanied by supporting documentation. He examined the records of forty-seven patients and opined that the documents did not support a certification of need for hospice in thirty-five percent of these patients' hospice certification periods. In his view, for those periods, any reasonable physician would have reached the conclusion he reached. He also found that the medical records were incomplete for at least three patients.

Care Alternatives' expert, Dr. Hughes, disagreed. For each certification that Dr. Jayes reviewed, Dr. Hughes opined that a physician could have reasonably determined that the prognosis for each patient was six months or less.

Care Alternatives moved for summary judgment arguing that Appellants could not make out the four prima facie elements of a claim under the FCA: falsity, causation, knowledge, and materiality. [2] *See United States ex rel.*

---

[2] Care Alternatives had also moved to dismiss the amended complaint for failure to comply with the statutory requirements of 31 U.S.C. § 3730(b)(2), which, among other things, requires a relator to submit a "written disclosure of substantially all material evidence and information the person possesses" in

9

*Petratos v. Genentech Inc.*, 855 F.3d 481, 487 (3d Cir. 2017). Most relevant to this appeal were Care Alternative's arguments that Appellants had not produced sufficient evidence of falsity. The Government submitted a statement of interest urging the District Court to reject the argument that the FCA requires evidence of an "objective falsehood."

The District Court granted summary judgment to Care Alternatives based solely on failure to show falsity. Relying on two district court decisions from Alabama and Texas, it rejected the Government's assertions and held that a "mere difference of opinion between physicians, *without more*, is not enough to show falsity." *Druding v. Care Alternatives, Inc.*, 346 F. Supp. 3d 669, 685 (D.N.J. 2018) (emphasis in original) (internal citation omitted). In doing so, it relied on the premise that medical opinions are subjective and cannot be false. *Id.* (quoting *United States ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 376 (5th Cir. 2004) (finding that "scientific judgments about which reasonable minds may differ cannot be 'false'" (internal citation omitted))).

Regarding the element of falsity, the District Court adopted a standard not previously embraced or established by this Court, which required Appellants to show evidence of "an objective falsehood," that the physician's prognosis of terminal

---

order for the Government to decide whether it will intervene in an action or move to dismiss the complaint. 31 U.S.C. § 3730(b)(2), (c)(2)(A). The District Court denied the motion. *Druding v. Care Alternatives, Inc.*, 346 F. Supp. 3d 669, 683–84 (D.N.J. 2018).

illness was incorrect, in order to prevail on the element of falsity. *Id.*

Appellants appealed, and the Government submitted an amicus brief advancing substantially the same argument as it had before the District Court.

## II.     JURISDICTION & STANDARD OF REVIEW

The District Court had jurisdiction pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732, and we have jurisdiction pursuant to 28 U.S.C. § 1291.  "Our review of a district court's decision at summary judgment is plenary," so, viewing "all facts in the light most favorable to the non-moving party and draw[ing] all inferences in that party's favor," "[w]e determine whether the moving party has established that there is no genuine dispute of material fact . . . ." *Forrest v. Parry*, 930 F.3d 93, 105 (3d Cir. 2019) (citations omitted).

## III.     DISCUSSION

The central question on appeal is whether a hospice-care provider's claim for reimbursement can be considered "false" under the FCA on the basis of medical-expert testimony that opines that accompanying patient certifications did not support patients' prognoses of terminal illness.  The answer is a straightforward yes.  In coming to this conclusion, we decline to adopt the District Court's "objective" falsity standard, as the test is inconsistent with the statute and contrary to this Court's interpretations of what is required for legal falsity.  The District Court also erred in its determination that clinical judgments cannot be "false" for the purposes of FCA liability.  In light of this analysis, we find Appellants' medical testimony creates a genuine dispute of material fact as to the element of falsity.

**A.**

In analyzing the statute's text, we find the premise of the District Court's holding—that a "mere difference of opinion" is insufficient to show FCA falsity—is at odds with the meaning of "false" under the statute. *Druding*, 346 F. Supp. 3d at 685. We also conclude that the District Court's "objective" falsity standard improperly conflates the elements of falsity and scienter, inconsistent with the application of the FCA.

As with any statutory interpretation question, our analysis begins with the text. *United Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 1999 (2016). The FCA provides that any person who "knowingly presents, or causes to be presented, a *false or fraudulent* claim for payment or approval" is liable to the United States for a civil penalty between $5,000 and $10,000 as well as treble damages. 31 U.S.C. § 3729(a)(1)(A) (emphasis added). It also imposes liability on any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a *false or fraudulent* claim." *Id.* § 3729(a)(1)(B) (emphasis added).

Since Congress did not define what makes a claim "false" or "fraudulent" under the FCA, the Supreme Court has looked to common law to fill the definitional gap. *Escobar*, 136 S. Ct. at 1999–2000 ("[A]bsent other indication, Congress intends to incorporate the well-settled meaning of the common-law terms it uses." (citation omitted)). Under the common law, an opinion can be considered "false" for purposes of liability. *See Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 183–86 (2015) (finding that an opinion may be a "false statement" in

12

determining liability under the securities laws); *Herskowitz v. Nutri/Sys., Inc.*, 857 F.2d 179, 184 (3d Cir. 1988) ("An opinion or projection . . . will be deemed untrue for purposes of the federal securities laws if it is issued without reasonable genuine belief or if it has no basis."); *see also* Restatement (Second) of Torts §§ 525 cmt. c, 539 cmt. a (1977) (instructing that an opinion may be false when the speaker makes an express statement contrary to the opinion he or she actually holds). Since there are circumstances in which an opinion may be considered "false" under common law, we find that the District Court's premise—an opinion is subjective and a difference of opinion is not enough to show falsity—is inconsistent with the meaning of "false" under the FCA.

Moreover, the District Court's "objective" falsity standard conflates the elements of scienter and falsity. Although the common law cases involving false opinions are often accompanied by a finding related to scienter, the plain language of the FCA denotes scienter as an element independent of falsity. 31 U.S.C. § 3729(a)(1)(A) (requiring "knowledge" separate from a "false or fraudulent claim"); *see Petratos*, 855 F.3d at 487 (stating an FCA violation has four elements: falsity, causation, knowledge, materiality). Combining the two elements into "falsity" reads the scienter element out of the text of the statute.

That scienter serves a distinct purpose under the FCA further supports separating the falsity and scienter analyses. Scienter helps to limit the possibility that hospice providers would be exposed to liability under the FCA any time the Government could find an expert who disagreed with the certifying physician's medical prognosis. *See United States ex rel. Polukoff v. St. Mark's Hosp.*, 895 F.3d 730, 743 (10th Cir. 2018) (noting scienter requirements are "rigorous" and can be

13

used to address excessive liability concerns). Indeed, the Supreme Court has instructed as much. *Escobar*, 136 S. Ct. at 2002 ("[I]nstead of adopting a circumscribed view of what it means for a claim to be false or fraudulent, concerns about fair notice and open-ended liability can be effectively addressed through strict enforcement of the [FCA]'s materiality and scienter requirements." (internal quotations and citations omitted)).

By requiring "factual evidence that Defendant's certifying doctor was making a *knowingly* false determination," the District Court's "objective" falsity standard conflates scienter and falsity. *Druding*, 346 F. Supp. 3d at 688 (emphases added). In finding that Appellants could not prove falsity because they had not produced evidence that any physician lied and "received a kickback to certify any patient as hospice eligible" or "certif[ied] any patient whom that physician believed was not hospice eligible," the District Court incorporated a scienter element into its analysis regarding falsity that was inconsistent with the text and application of the statute. *Id.* at 687.

**B.**

The District Court's "objective" falsity standard is also at odds with this Court's cases that have interpreted falsity to encompass a theory of liability based on non-compliance with regulatory instructions and not just objectively verifiable facts.

As the District Court itself recognized, a claim can be proven "false" in two ways: factually, when the facts contained within the claim are untrue, and legally, "when the claimant . . . falsely certifies that it has complied with *a statute or regulation* the compliance with which is a *condition* for

14

Government payment." *Druding*, 346 F. Supp. 3d at 682 (quoting *United States ex rel. Wilkins v. United Health Grp., Inc.*, 659 F.3d 295, 305 (3d Cir. 2011)) (emphasis added) (internal quotation marks omitted); *see also Petratos*, 855 F.3d at 487 ("[A] claim can be false if it does not comply with statutory conditions for payment . . . ."); *Polukoff*, 895 F.3d at 741 (noting legal falsity can be express, such as a false affirmative statement of compliance with a statutory, regulatory, or contractual prerequisite, or it can be implied— for instance, the absence of a material disclosure that would have prevented compliance with a statutory, regulatory, or contractual prerequisite). Although legal falsity necessarily encompasses situations of factual falsity, for instance, where a physician's lies about medical test results would render certifications for reimbursement inaccurate and non-compliant with regulations, *cf. United States v. Paulus*, 894 F.3d 267, 273 (6th Cir. 2018), the District Court nevertheless limited its analysis to factual falsity.

According to the District Court, a medical expert's opinion is false for purposes of FCA liability only when there is evidence of factual inaccuracy. In other words, opinions being subjective, a differing medical conclusion regarding a patient's prognosis alone is not enough to show the certifying physician's determination of terminal illness was factually incorrect.

We disagree with the District Court's decision to circumscribe FCA falsity to findings of factual falsity. This runs contrary to the cases in this Court, which have recognized falsity to include legal falsity. *See, e.g.*, *Petratos*, 855 F.3d at 486; *Wilkins*, 659 F.3d at 305; *United States ex rel. Quinn v. Omnicare Inc.,* 382 F.3d 432, 441 (3d Cir. 2004); *see also United States v. Neifert-White Co.*, 390 U.S. 228, 232 (1968)

15

(observing that the FCA "was intended to reach all types of fraud, without qualification, that might result in financial loss to the Government"). In other words, our cases instruct that FCA falsity simply asks whether the claim submitted to the government as reimbursable was in fact reimbursable, based on the conditions for payment set by the government. *See Wilkins*, 659 F.3d at 305 (explaining that "[a] legally false FCA claim is based on a 'false certification' theory of liability" (citations omitted)); *see also United States ex rel. Walker v. R&F Props. of Lake Cty., Inc.*, 433 F.3d 1349, 1356 (11th Cir. 2005) ("Medicare claims may be false if they claim reimbursement for services or costs that either are not reimbursable or were not rendered as claimed.").

Under legal falsity, Appellants must show that Care Alternatives failed to meet at least one of the two regulatory requirements: (1) that a physician certified the patient is terminally ill and (2) that the certification is in accordance with section 418.22, which requires that "[c]linical information and other documentation that support the medical prognosis [] accompany the certification . . . ." 42 C.F.R. §§ 418.20, 418.22(b)(2). Based on this theory, we find that disagreement between experts as to a patient's prognosis may be evidence of the latter; its relevance need not be limited to evidence of the accuracy of another physician's judgment.

This interpretation is also supported by the Tenth Circuit, which recently reversed a similar district court decision that had adopted an "objective" falsity requirement for FCA claims. *Polukoff*, 895 F.3d at 743, 745–46. In *Polukoff*, the Tenth Circuit considered whether a cardiologist falsely represented in his claims for Medicare reimbursement that the procedures he was performing were reasonable and necessary. *Id.* at 735, 738–39. In finding it "possible for a

medical judgment to be 'false or fraudulent' as proscribed by the FCA," the Tenth Circuit emphasized that liability is not premised on factual falsity alone, but a certification is false simply "if the procedure was not reasonable and necessary under the government's definition of the phrase." *Id*. at 742–43. There, the Tenth Circuit adopted the view that FCA falsity is based on legal falsity—that falsity is simply a question of whether the claim is reimbursable, that is, compliant with the Medicare reimbursement instructions. *Id*. at 742–43. In so doing, it found that the plaintiff-physician's opinion that the defendant-cardiologist's procedures were not "reasonable and necessary" was a cognizable allegation as to whether the cardiologist's reimbursement claims were "false" for failing to comply with Medicare procedures. *Id*. at 743–44.

So, based on our cases and the Tenth Circuit's rationale in *Polukoff*, we will not limit our inquiry to factual falsity and instead apply a theory of legal falsity.

**C.**

Moreover, we reject the District Court's bright-line rule that a doctor's clinical judgment cannot be "false." In *United States v. Paulus*, the Sixth Circuit reversed a cardiologist's acquittal for healthcare fraud based on expert testimony that he recorded severe arterial blockage in patients' medical records when the angiograms showed only mild or no blockage. 894 F.3d at 276–77, 280. In doing so, the Sixth Circuit stressed that medical "opinions are not, and have never been, completely insulated from scrutiny." *Id*. at 275. For example, "opinions may trigger liability for fraud when they are not honestly held by their maker. . . ." *Id.* Such was the case in *Paulus* where the defendant was charged with lying about the results of angiograms he conducted and billed taxpayers for

17

procedures conducted based on those results. *Id.* at 272–73. As the Sixth Circuit explained, a good faith medical opinion is not punishable, but a bright-line rule that medical opinions can never be false fails to hold accountable a physician who "saw one thing on the angiogram and consciously wrote down another, and then used that misinformation to perform and bill unnecessary procedures." *Id*. at 276. The court concluded that whether the defendant was acting in good faith or committing fraud by misrepresenting the angiogram results was an appropriate question for the jury. *Id*. at 276–77; *see also United States v. Rockwell*, 781 F.2d 985, 990 (3d Cir. 1986) ("The law will not countenance a usurpation by the court of the function of the jury to decide the facts and to assess the credibility of the witnesses."). In weighing that decision, the jury could consider evidence of different doctors who had interpreted the angiograms differently. *Paulus*, 894 F.3d at 276–77.

We can apply these same principles to our civil FCA case. The "reliability and believability of expert testimony . . . is exclusively for the jury to decide." *Id*. at 277 (citations omitted). Contrary to the District Court's reasoning, medical opinions may be "false" and an expert's testimony challenging a physician's medical opinion can be appropriate evidence for the jury to consider on the question of falsity.

**D.**

In adopting and applying an "objective" falsity standard, the District Court relied on *United States v. AseraCare Inc.*, 153 F. Supp. 3d 1372 (N.D. Ala. 2015) ("*AseraCare I*") and *United States v. AseraCare Inc.*, 176 F.

18

Supp. 3d 1282 (N.D. Ala. 2016) ("*AseraCare II*").[3]  Since the Eleventh Circuit issued its opinion affirming both *AseraCare I* and *AseraCare II*'s adoption of the "objective" falsity standard shortly before oral argument in this case, we briefly discuss our reasons for departing from our sister circuit.  *United States v. AseraCare, Inc.*, 938 F.3d 1278 (11th Cir. 2019) ("*AseraCare III*").

In *AseraCare*, former employees of the defendant hospice provider brought a *qui tam* suit alleging that AseraCare had a practice of knowingly submitting unsubstantiated

---

[3] It also relied on *United States ex rel. Wall v. Vista Hospice Care, Inc.*, No. 3:07-CV-00604-M, 2016 WL 3449833 (N.D. Tex. June 20, 2016) ("*Vista Hospice*"), an unreported case from the Northern District of Texas whose relevant facts and holding are nearly identical to those in *AseraCare I* and *AseraCare II*.  Like Appellants here and the plaintiffs in *AseraCare*, the plaintiff-relator in *Vista Hospice* was also a former employee of the defendants, which are hospice care providers in fourteen states.  *Vista Hospice*, 2016 WL 3449833, at *1.  The *qui tam* suit alleged that the defendants violated the FCA by "causing patients who were not eligible for the MHB to be certified as eligible, and then submitting claims for ineligible patients[.]"  *Id.*  As here, the district court granted summary judgment in favor of defendants, finding that a report by the relator's expert, a hospice physician, insufficient to create a genuine dispute of material fact regarding the element of falsity.  *Id.* at *5, *17–18 (holding that "[a] testifying physician's disagreement with a certifying physician's prediction of life expectancy is not enough to show falsity" (citing *AseraCare II*, 176 F. Supp. 3d at 1283)).

Medicare claims in violation of the FCA. *Id.* at 1284. The Government chose to intervene. *Id.* In deciding AseraCare's first motion for summary judgment, the district court declined to adopt a "reasonable doctor" standard for the assessment of falsity, which would have required the Government to show that a reasonable physician could not have held the opinion that the patient was certifiably ill. *Id.* at 1285–86. The case proceeded to a bifurcated trial where the falsity element was tried first, followed by the remaining elements and the other common law claims in the second phase. *Id.* at 1286. During the first phase, the parties presented dueling expert opinions from two doctors about whether, based on their own clinical judgment, the medical records of particular patients supported AseraCare's certifications that the patients were terminally ill. *Id.* at 1287. The question was then put to the jury to decide which expert's testimony was more persuasive. *Id.* at 1288–89. Following the partial verdict in which the jury found some of the medical records supported AseraCare's certifications and some did not, AseraCare moved for judgment as a matter of law, arguing that the court had articulated the wrong standard for falsity in its instructions to the jury. This time, the district court agreed that it had committed reversible error and that it should have advised the jury that the FCA's falsity element requires proof of an objective falsehood and that "a mere difference of opinion [between physicians] , *without more*, is not enough to show falsity." *AseraCare I*, 153 F. Supp. 3d at 1384.

The district court then took the extra step of considering summary judgment *sua sponte* and, after additional briefing from the parties, granted summary judgment in AseraCare's favor based on the district court's newly adopted "objective" falsity standard. *AseraCare II*, 176 F. Supp. 3d at 1284, 1286.

20

On appeal, the Eleventh Circuit affirmed the district court's adoption of the "objective" falsity test. *AseraCare III*, 938 F.3d at 1296–97. In setting up its discussion of FCA falsity, the Eleventh Circuit rejected the Government's framing of the falsity inquiry as a question of "whether the clinical information and other documentation accompanying a certification of terminal illness support[s] . . . the physician's certification." *Id.* at 1294. Instead, it concluded that the supporting documentation requirement is only designed to address the mandate that there be a medical basis for certification. *Id.* at 1296–97. In deciding a claim's eligibility is therefore premised on the physician's clinical judgment and decision to certify a patient as terminally ill, the Eleventh Circuit limited the relevant inquiry to whether the Government had adduced sufficient evidence of "the accuracy of the physician's clinical judgment regarding terminality." *Id.* at 1294, 1296.

We depart from this framing of FCA falsity. As previously articulated, limiting falsity to factual falsity is inconsistent with our case law, which reads FCA falsity more broadly as legal falsity, encompassing circumstances where a claim for reimbursement is non-compliant with requirements under the statute and regulations. The MHB regulations state two requirements: (1) that a physician certifies the patient as terminally ill and (2) that clinical information and documentation supporting the prognosis accompany the certification. 42 C.F.R. §§ 418.20, 418.22(b)(2). Under a legal falsity theory, a medical opinion that differs from the certifying physician's opinion is therefore relevant evidence of the latter requirement, whether there was documentation accompanying the certification that supported the medical prognosis.

21

The Eleventh Circuit also determined that clinical judgments cannot be untrue. *AseraCare III*, 938 F.3d at 1297. ("[A] reasonable difference of opinion among physicians reviewing medical documentation *ex post* is not sufficient on its own to suggest that those judgments . . . are false under the FCA."). We again disagree. In reaching the opposite determination, we invoke the principles previously articulated—that the common-law definition of fraud permits a finding that subjective opinions may be considered false and that medical opinions can be false and are not shielded from scrutiny. *Paulus*, 894 F.3d at 276–77. We therefore find that a difference of medical opinion is enough evidence to create a triable dispute of fact regarding FCA falsity.

This does not mean that objectivity is never relevant for FCA liability. However, we find that objectivity speaks to the element of *scienter*, not *falsity*. As discussed above, the text and application of the FCA require that the elements of falsity and scienter be analyzed separately. In fact, *AseraCare III* supports this position. The Eleventh Circuit affirmed the adoption of the "objective" falsity test, but it reversed the District Court's *sua sponte* grant of summary judgment in favor of the defendants and remanded for further consideration of evidence the Government had intended to present to show "knowledge of the falsity of the claim." *AseraCare III*, 938 F.3d at 1302. Although the Eleventh Circuit instructions on remand were to consider all of the evidence "to determine whether a triable issue existed regarding *falsity*," *id.* at 1303 (emphasis added), we make clear that in our Court, findings of falsity and scienter must be independent from one another for

22

purposes of FCA liability.[4]  More than a formality, we seek to avoid the precise outcome in *AseraCare II*, where the district court folded the element of scienter into its "objective" falsity test, but failed to fully consider evidence of scienter and, as a result, prematurely granted summary judgment.

For these reasons, we are persuaded that the District Court's reliance on *AseraCare II* was misplaced.

**E.**

Since the District Court's decision to grant summary judgment in favor of Care Alternatives was based solely on its analysis of the falsity element, our decision is limited to the same.  So, regarding FCA falsity, we reject the objective falsehood standard.  Instead, we hold that for purposes of FCA falsity, a claim may be "false" under a theory of legal falsity, where it fails to comply with statutory and regulatory requirements. We also find that a physician's judgment may be scrutinized and considered "false."

We therefore find that a physician's expert testimony challenging a hospice certification creates a triable issue of fact for the jury regarding falsity.  Since Dr. Jayes's expert report

---

[4] We acknowledge that the Seventh Circuit's view differs somewhat from our instruction to keep falsity and scienter separate.  *United States ex rel. Yannocopoulos v. Gen. Dynamics*, 652 F.3d 818, 836–37 (7th Cir. 2011) (citing *United States ex rel. Lamers v. City of Green Bay*, 168 F.3d 1013, 1018 (7th Cir. 1999) (requiring an objective falsehood based on a test that conflates an analysis of the falsity and knowledge elements)).

has done just that, we conclude the report was sufficient evidence to create a genuine dispute of material fact. Having found that Appellants adduced enough evidence to overcome summary judgment as to the element of falsity, we need not address Appellants' other arguments regarding whether the evidence they submitted met the District Court's erroneous "objective" falsity test. Nor do we opine as to Appellants' odds of surviving summary judgment on the other prima facie elements, which the District Court did not reach.

## IV. CONCLUSION

We therefore reverse the District Court's grant of summary judgment in favor of Defendant and remand for consideration of the other elements of FCA liability, consistent with this opinion.